# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| DAVID HEATH SWANSON, | ) | |
| | ) | |
| Movant, | ) | |
| vs. | ) | 1:08-cv-1180-SEB-DKL |
| | ) | |
| UNITED STATES OF AMERICA. | ) | |
| | ) | |
| Respondent. | ) | |

### Entry Denying Motion for Relief Pursuant to 28 U.S.C. § 2255 and Denying Certificate of Appealability

Movant David Heath Swanson ("Swanson") is serving a 151-month sentence in federal prison as a result of a jury verdict finding him guilty on all eighteen counts charged in cause number 1:01-cr-083-01-SEB-KPF. The specific offenses of which he was convicted are "wire fraud, money laundering, interstate transport of converted funds, and tax evasion stemming from a complex scheme of financial manipulations through which Swanson was able to siphon funds for his own personal use as he assisted large agricultural corporations in their various acquisitions and investments." *U.S. v. Swanson*, 394 F.3d 520, 521 -522 (7th Cir. 2005) (hereinafter *Swanson I*). Swanson now seeks to vacate, set aside, or correct the sentence imposed in his criminal case pursuant to 28 U.S.C. § 2255. The Court has considered the motion filed, the response along with the expanded record, including evidence from the hearing conducted on March 17, 2011, and the parties' arguments. For the reasons explained below, Swanson's request for relief pursuant to § 2255 is **denied.** A certificate of appealability is also **denied.**

# I. Background

Between 1991 and 2001, Swanson "held various executive positions at midwestern businesses involved in agriculture. Swanson also dabbled in his own business ventures, seeking to buy and sell companies through various corporate enterprises he created on his own. The government charged Swanson with wire fraud, money laundering, interstate transport of converted funds, and tax evasion stemming from schemes wherein Swanson would convince a large corporation to acquire another company, and then would, in short, skim funds from the transaction for his own personal use." *Swanson I*, 394 F.3d at 522. He also submitted and obtained "reimbursement" for phony expenses he claimed were associated with the acquisitions.

In *Swanson I*, the Court of Appeals provided the following summary of the indictment which is worth repeating here, given the challenges raised by Swanson in his pending § 2255 motion:

> The indictment provided a lengthy description of four schemes, but alleged executions of the scheme related to only two of these four episodes. The other two were included primarily for context and background.
>
> In the first scheme, Swanson, as a self-employed consultant, approached Archer Daniels Midland (ADM) with the idea of buying Central Soya Corporation-an entity for which he had formerly served as CEO. Swanson billed ADM for $1,358,000 for his work on the acquisition. The indictment charged that this figure included requests for reimbursement of expenses that Swanson did not incur, including a request for $278,000 to the consulting firm of Vickers & Allen, an entity that had no formal existence at the time and did not perform any work.
>
> The second scheme involved Countrymark Cooperative, Inc.'s acquisition of Buckeye Feed Mills, Inc. In 1995, Swanson, through a company he formed, attempted to purchase Buckeye. That initial negotiation failed for lack of financing, but Swanson resurrected the deal by giving his guarantee that he would be personally liable for a $100,000 penalty if the

acquisition did not close within sixty days. Shortly thereafter, Swanson accepted a position as chief executive officer of Countrymark and convinced the Countrymark board of directors to purchase Buckeye. The indictment alleged that Swanson claimed and received reimbursement expenses from Countrymark for expenditures Swanson made during his personal efforts to acquire Buckeye and that he again sought payment for services Vickers & Allen did not actually perform.

After the completion of the Buckeye acquisition, Swanson also convinced Countrymark's board of directors to acquire Malta Clayton, an agricultural feed business in Mexico-the third scheme alleged in the indictment. Before the matter had been presented to the Countrymark board, however, Swanson signed an agreement with Malta Clayton obligating Countrymark to purchase Malta Clayton via the Project Explorer Mark II Corporation-an entity for which Swanson was the sole director and one that, at the time, had not been incorporated. Swanson initially informed the board that Countrymark's share of the acquisition costs would be $5 million. Ultimately and through various routes, Countrymark spent $25 million to purchase Malta Clayton (another corporation, Growmark, contributed $10 million). The actual acquisition cost of Malta Clayton was $31 million. After the acquisition, $4 million dollars remained in Project Explorer Mark II's account, at the defendant's sole disposal. The government alleged that Swanson took $2 million for his personal use. In addition, once again, Swanson submitted invoices from Vickers & Allen.

Finally, in scheme four, the indictment alleged that Swanson unlawfully requested and received reimbursement for expenses he claimed to have incurred when Countrymark sold a portion of its stock in Buckeye. Swanson took the $400,000 facilitation fee generated by the sale and transferred it to a bank account under his exclusive control. Swanson later told the Countrymark board that the $400,000 facilitation fee was being used for expenses on a new project in New York City. When Countrymark attempted to retrieve the $400,000, they found that only $300,000 remained. Swanson claimed that Countrymark owed him $168,557.42 of the funds as reimbursement for various expenses-$113,000 of which he had already received. He directed the treasurer of Countrymark to deposit an additional $55,000 in his personal bank account to make up the difference.

Although count 1 of the indictment described all four schemes, the indictment alleged executions only of schemes three and four-the Malta Clayton acquisition and Countrymark's sale of Buckeye stock. Counts two through eight alleged the transportation of the stolen money from scheme three-the Malta Clayton acquisition-across state lines. Count 9 alleged that Swanson committed wire fraud when he transferred $400,000 from Countrymark to an account he controlled during the commission of scheme

four-Countrymark's sale of Buckeye stock. And counts 10 through 13 alleged the transportation of stolen funds from scheme four across state lines. Counts 14 through 17 charged money laundering incident to scheme three and count 18 charged tax evasion. None of the counts focused on the events involved in fraud schemes one and two described above.

*Swanson I*, 394 F.3d at 522-23.

## II. Procedural History

On October 10, 2002, after a three-week trial, a jury convicted Swanson on all counts charged in the indictment. Swanson failed to appear for his scheduled sentencing hearing on January 24, 2003. A bench warrant issued and he was apprehended as a fugitive on February 14. He was sentenced on March 20, 2003, under the 2001 version of the Sentencing Guidelines.

With new counsel, Terence F. MacCarthy ("Attorney MacCarthy"), Swanson appealed his sentence, but not his conviction. He argued, first, that the district court should have utilized the 1998 version of the Guidelines, rather than the 2001 version; second, that the district court was required to make an independent judgment as to the amount of loss when calculating the sentencing guidelines range and the amount of restitution; and third, that the district court erred by ordering a $54 million forfeiture, when instead Swanson was convicted of laundering only $1.9 million. *Swanson I*, 394 F.3d at 523-24.

After the United States conceded that the 1998 version of the Guidelines should have been applied in determining Swanson's sentence, the Court of Appeals remanded the case to allow Swanson's sentence to be reconsidered based on the 1998 United States Sentencing Commission Guidelines Manual and to reconsider the amounts ordered as restitution and forfeiture pursuant to the sentencing principles adopted in *United States v. Booker*, 543 U.S. 220 (2005). *Swanson I*, 394 F.3d at 523-24.

At the November 9, 2005, resentencing hearing Swanson was represented by William H. Theis ("Attorney Theis"). During that hearing, this court recalculated the fraud loss at $6.7 million utilizing the government's new itemization. The loss calculation amount mirrored the court's prior determination. The court applied U.S.S.G. § 2F1.1, the applicable offense guideline from the 1998 version of the Guidelines, again added four levels under § 3B1.1(a), and determined that Swanson was an organizer or leader of criminal activity that was otherwise extensive. The court then sentenced Swanson to 151 months of imprisonment, the high end of the resulting range of 121 to 151 months. In addition, with no proposed restitution figure provided by Swanson, the court adopted the government's calculations, which credited Swanson for repayments made to Countrymark, and ordered Swanson to pay $2.2 million in restitution. *United States v. Swanson*, 483 F.3d 509 (7th Cir. 2007) (hereinafter *Swanson II*).

Swanson again appealed his sentence and the forfeiture orders, but not his conviction, to the Seventh Circuit. In his second appeal, Swanson specifically challenged the sentencing court's calculation of the fraud loss and the amount of restitution. In addition, he pressed a new contention–that the sentencing court erroneously applied an upward adjustment for his role as an organizer or leader of extensive criminal activity under the Guidelines. *Swanson II*, 483 F.3d at 511. The appellate court rejected Swanson's fraud loss claim, finding in part that the "unsupported assertion that Swanson might have legitimately spent some of the $4 million on closing costs is frivolous." *Swanson II*, 483 F.3d at 513. The appellate court also declined to consider Swanson's argument that it was improper for the sentencing court to apply the upward adjustment of guideline 3B1.1(a) because Swanson "waived this issue by failing to raise it during his first appeal." *Swanson*

*II*, 483 F.3d at 515. On September 3, 2008, Swanson filed the pending motion to vacate, set aside or correct sentence pursuant to § 2255.

### III. Section 2255

The scope of relief available under 28 U.S.C. § 2255 is narrow. The parameters of available relief under this statute have been previously addressed by the Seventh Circuit:

> Section 2255 is not a way to advance arguments that could have been presented earlier–especially not when the arguments rest entirely on a statute. *See Reed v. Farley*, 512 U.S. 339 (1994). Although § 2255 ¶ 1 permits a collateral attack on the ground that 'the sentence was imposed in violation of the Constitution or laws of the United States,' only a small portion of statutory claims demonstrate that the sentence or conviction is itself a violation of law. The error must be so fundamental that a 'complete miscarriage of justice' has occurred. *Reed*, 512 U.S. at 348 (quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)). Other 'non-constitutional errors which could have been raised on appeal but were not are barred on collateral review–regardless of cause and prejudice.' *Bontkowski v. United States*, 850 F.2d 306, 313 (7th Cir. 1988).

*Young v. United States*, 124 F.3d 794, 796 (7th Cir. 1997) (internal citations altered). Thus, relief pursuant to § 2255 is limited to an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice. *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991).

Swanson's current claims for relief are based on two theories: first, that the government failed to disclose exculpatory evidence and, second, that he was denied his Sixth Amendment right to the effective assistance of counsel.

### A. Brady Violation

Swanson asserts that the government failed to disclose exculpatory evidence, in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), including evidence that third parties had

investigated and approved the Buckye and Malta Clayton acquisitions. *Brady* requires "that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Kyles v. Whitley,* 514 U.S. 419, 432 (1995) (citations omitted). To establish a *Brady* violation, a defendant must show: (1) evidence favorable to the defendant (2) that is suppressed by the prosecution, (3) resulting in material prejudice to the defendant. *Newell v. Hanks*, 335 F.3d 629, 632 (7th Cir. 2003). Our review of this claim reveals that Swanson has provided absolutely no evidence that exculpatory information exists or existed at trial and that the government has failed to disclose this evidence to him. Swanson's speculation in this regard is not sufficient to establish a *Brady* violation and his claim for relief pursuant to § 2255 on this ground is therefore denied.

### B. Ineffective Assistance of Counsel

Under the Sixth Amendment to the U.S. Constitution, the accused has a right to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The right to the effective assistance of counsel is denied when the performance of counsel falls below an objective standard of reasonable professional conduct and thereby prejudices the defense. *Yarborough v. Gentry,* 540 U.S. 1, 5 (2003) (citing *Strickland v. Washington,* 466 U.S. 668, 688-94 (1984)). For a petitioner to establish that his "counsel's assistance was so defective as to require reversal" of a conviction or a sentence, he must make two showings: (1) deficient performance that (2) prejudiced his defense. *Strickland,* 466 U.S. at 687.

With respect to the first prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 521 (2003) (quoting *Strickland,* 466 U.S. at 688). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. To that end, the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). In addition, the performance of counsel under *Strickland* should be evaluated from counsel's perspective at that time, making every effort to "eliminate the distorting effects of hindsight." *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688); *see also Kokoraleis v. Gilmore*, 131 F.3d 692, 696 (7th Cir. 1997). Thus, in assessing the reasonableness of counsel's decisions, a court must consider the actual reasons why counsel made their decisions. *Wiggins*, 539 U.S. at 526-27; *Goodman v. Bertrand*, 467 F.3d 1022, 1029 (7th Cir. 2006) ("it is not the role of a reviewing court to engage in a post hoc rationalization for an attorney's actions by constructing strategic defenses that counsel does not offer.").

With respect to the prejudice requirement, it must be shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694; *see also Benefiel v. Davis,* 357 F.3d 655, 661 (7th Cir. 2004). It is not enough for a petitioner to show that "the errors had some conceivable effect on the outcome of the proceeding." *Strickland,* 466 U.S. at 693. A petitioner must specifically explain how the outcome at trial would have been different absent counsel's ineffective assistance. *Berkey v. United States,* 318 F. 3d 768, 773 (7th Cir. 2003).

Swanson alleges multiple instances of ineffective assistance of counsel, each of which is addressed below.

### 1. Surplusage in the Indictment

As previously discussed, the indictment provided a lengthy description of four schemes, but alleged executions of only two of the four episodes. Swanson argues that, by the end of the case, the government had shown no fraud in either the first scheme (ADM's acquisition of Central Soya) or the second scheme (Countrymark's acquisition of Buckeye) described in the Indictment and that evidence related to these schemes had no legitimate place in the trial and its inclusion therefore prejudiced Swanson by providing evidence that Swanson was a serial fraudster. Swanson's first specification of ineffective assistance of counsel is that his attorney failed to request a mistrial, move to strike the surplusage, or request a limiting instruction directing the jury to disregard the allegations and attempted proof as to these two episodes. The government argues that Swanson's prior counsel's performance was not deficient nor was Swanson prejudiced on any of these grounds, because the first and second schemes (ADM's acquisition of Central Soya and Countrymark's acquisition of Buckeye) were at most background information to the charged counts that did not alter or otherwise effect the elements of the crimes charged. Instead, the indictment alleged executions only of schemes three and four-the Malta Clayton acquisition and Countrymark's sale of Buckeye stock.

### a. Surplusage

The information in schemes one and two of the indictment are properly viewed as surplusage. The allegations regarding the first and second schemes are not necessary to

establish a violation of the statutes in issue, but were clearly included as elaboration on the nature of the defendant's charged fraudulent activity.[1] As noted by the Seventh Circuit in the first direct appeal of this action, "[i]ndictments often contain superfluous background information that is not essential to the elements of the charge." *Swanson I*, 394 F.3d at 525. "Allegations in an indictment that are not essential to prove the crime charged are mere surplusage and need not be proved nor addressed in instructions to the jury." *Id.* In *United States v. Peters*, 435 F.3d 746 (7th Cir. 2006), the Seventh Circuit explained that "[a]llegations in an indictment that are not necessary to establish a violation of the statute in issue are mere surplusage and may be disregarded if the remaining allegations are sufficient to charge a crime." *Id.* at 752 (holding that the court did not commit plain error in failing to strike the sentencing guidelines from the superceding indictment).

> The [Supreme] Court has long recognized that an indictment may charge numerous offenses or the commission of any one offense in several ways. As long as the crime and the elements of the offense that sustain the conviction are fully and clearly set out in the indictment, the right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime.

*U.S. v. Miller,* 471 U.S. 130, 136 (1985) (*citing Ford v. United States*, 273 U.S. 593 (1927);

---

[1] As stated previously:

Although count 1 of the indictment described all four schemes, the indictment alleged executions only of schemes three and four-the Malta Clayton acquisition and Countrymark's sale of Buckeye stock. Counts two through eight alleged the transportation of the stolen money from scheme three-the Malta Clayton acquisition-across state lines. Count 9 alleged that Swanson committed wire fraud when he transferred $400,000 from Countrymark to an account he controlled during the commission of scheme four-Countrymark's sale of Buckeye stock. And counts 10 through 13 alleged the transportation of stolen funds from scheme four across state lines. Counts 14 through 17 charged money laundering incident to scheme three and count 18 charged tax evasion. None of the counts focused on the events involved in fraud schemes one and two described above.

*Swanson I*, 394 F.3d at 522-23.

*Salinger v. United States*, 272 U.S. 542 (1926); *Berger v. United States*, 295 U.S. 78, 83 (1935); *Hall v. United States*, 168 U.S. 632, 638-40 (1898)); *see also U.S. v. Quintanilla*, 2 F.3d 1469, 1475 (7th Cir. 1993). Here, information described in the first scheme (ADM's acquisition of Central Soya) and the second scheme (Countrymark's acquisition of Buckeye) was provided for "context and background," *see Swanson I*, 394 F.3d at 523, and as such it was surplusage which created neither errors nor prejudice warranting a motion to strike or a limiting instruction. The remaining allegations were sufficient to charge the crimes alleged in the indictment and permit a jury to return a verdict as to each offense. Thus, Swanson's counsel did not err in failing to move to strike this material or otherwise object to it and their performance was not ineffective in this respect.

### b.    Motion for Mistrial

Swanson argues that, at the close of the government's case, his trial counsel should have moved for (and this court should have granted) a mistrial. See Rule 26.3 of the *Federal Rules of Criminal Procedure* (regarding a motion for mistrial). The court has been unable to discern based on any substantive legal authority cited in Swanson's briefing a requirement of a mistrial under the circumstances presented here, nor has the court discovered any such authority through its own independent research. Accordingly, we hold that Swanson was not prejudiced by his trial counsel's failure to seek a mistrial because such a request would have been denied as lacking any legal authority.

But perhaps Swanson intends the word mistrial to evoke Rule 29 of the *Federal Rules of Criminal Procedure.* Rule 29 provides that, after the close of the government's evidence, the court on the defendant's motion must enter a judgment of acquittal on any

offense for which the evidence was insufficient to sustain a conviction. However, as previously explained, the descriptions of the first and second schemes, while relevant to the charges, were extraneous in terms of the Government's evidence offered to prove the essential elements of the claims that Swanson committed wire fraud, money laundering, tax fraud, or received stolen money. Swanson's trial counsel clearly understood this predicament, and, far from being ignorant of these issues and strategic choices, chose to use the information laid out as schemes one and two to Swanson's advantage. As Attorney Voyles explained at the evidentiary hearing on the pending motion:

> The Rule 29 motion is a motion for directed verdict as to a count. These were not counts . . . they were like background about Malta Clayton . . . and it's clearly evidence that the Government can offer.

Evid. Hrg. Tr., p. 55-56. We thus conclude that Swanson's trial counsel did not err in failing to move pursuant to Rule 29 for a judgment of acquittal as to any count charged in the indictment because this Court would not have granted that request had it been made. The evidence was sufficient to sustain a conviction on all counts charged in the indictment, as the jury so found, and those charges did not include the background factual explications of schemes one and two.

Swanson's reliance on *United States v. Beverly*, 913 F.2d 337 (7th Cir. 1990), *aff'd sub nom. Griffin v. United States*, 502 U.S. 46 (1991), to support his position that he was entitled to a judgment of acquittal is misplaced. Swanson asserts that this case provides the relevant authority regarding how a failure of proof affects the trial of a case. In *Beverly*, the relevant issue was whether defendant Ms. Griffin was entitled to a new trial. "[Ms. Griffin] maintains that, because the jury returned a general verdict, it is impossible to determine whether she was convicted for conspiracy to defraud the IRS-for which there is

sufficient evidence-or for conspiracy to defraud the DEA-which the government failed to prove." *Beverly*, 913 F.2d at 361. The Seventh Circuit upheld Ms. Griffin's conviction, even though the evidence failed to establish the DEA objective of the charged conspiracy, because the evidence supported her conviction under the tax objective. The Supreme Court affirmed the Seventh Circuit's opinion holding that "a general jury verdict [is] valid so long as it [is] legally supportable on one of the submitted grounds-even though that gave no assurance that a valid ground, rather than an invalid one, was actually the basis for the jury's action." *Griffin*, 502 U.S. at 49. Swanson references dicta in *Beverly*, in which the Court of Appeals stated that, although it did not understand why the district court failed to grant a partial judgment of acquittal with respect to the DEA count, such a failure did not result in substantial prejudice because the jury was properly instructed. *Beverly*, 913 F.3d at 365.

*Beverly* and *Griffin* do not support Swanson's claim that acquittal would have been the proper response to the government's alleged failure of proof of the first and second schemes charged in the indictment. To the contrary, that precedent clearly supports the guilty verdicts returned in this case. The indictment included charges limited to schemes three and four–the Malta Clayton acquisition and Countrymark's sale–as parts of the overall fraud charged in Count 1 of the indictment. Because sufficient evidence of fraud was presented as to both of these schemes, judgment of acquittal under Rule 29 would not have been appropriate, and the failure to file a motion seeking such did not constitute ineffective assistance of trial counsel.

*c.  Motion to Strike*

Swanson next contends that his trial counsel erred in failing to move to strike the surplusage. *See* Rule 7.3(d) (regarding motion to strike surplusage from the indictment). We also reject this claim because "[s]urplusage should not be stricken unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." *Peters*, 435 F.3d at 753 (citation and internal quotation omitted). As previously noted, because the information described in the first and second schemes was relevant to the crimes charged, it did not lead to the admission of any evidence which would have prejudiced the jury determination as to Swanson's guilt. The government correctly notes that Swanson's positions in the agricultural business community and his relationship with ADM, Central Soya, and Countrymark were relevant to its proof relating to his having had the means and knowledge to commit the crimes charged. This information also demonstrated Swanson's reputation in the agribusiness community and explained the reasons others may not have questioned his behavior. Accordingly, we hold that Swanson was not prejudiced by his trial counsels' failure to move to strike the surplusage from the indictment as such a request would in all likelihood have been denied.

*d.  Limiting Instruction*

Swanson next argues that his trial counsel should have sought an instruction from the Court directing the jury to ignore the unproven episodes of fraud. If such an instruction had been given, Swanson contends that the government's case would have been seriously impaired and his chance for an acquittal would have become substantial.

As previously noted, Swanson's trial counselors chose to exploit the Government's

failure to show that two of the alleged schemes were unlawful, hoping for a "ripple effect" relating to the remaining two schemes suggesting they too were lawful. Thus, the attorneys did not violate the Sixth Amendment when they failed to request a limiting instruction directing the jury to ignore the evidence submitted in support of the first and second scheme described in Count I of the Indictment. Swanson's trial counselors opted to argue that ADM's purchase of Central Soya and Countrymark's purchase of Buckeye overall were sound purchases, and sought to convince the jury that, if at least half of the schemes presented in the indictment were legitimate, the other transactions were also sound. As explained by Attorney Voyles at the evidentiary hearing,

> . . . those two transactions helped us legitimize the transactions that the Government was moving forward on . . . it helps when everything you're doing, or at least 50 percent of what you're doing was legitimate, and that may call into question a reasonable doubt of the other transactions. . . Here's a man who had two very prominent 500 Fortune companies that he had done transactions [with] that were valid . . . our defense was based upon showing that [Swanson] was a legitimate businessman and these two transactions certainly helped us make that argument.

Evid. Hrg. Tr., p. 51-52. This court "must defer to counsel's tactical decisions," avoid "the distorting effects of hindsight" and give counsel the benefit of a strong presumption of reasonableness. *Strickland*, 466 U.S. at 689; *Holman v. Gilmore*, 126 F.3d 876, 881-81 (7th Cir. 1997). Moreover, we can conceive of no realistic basis on which to conclude that the outcome of the trial would not have been different had Swanson's trial counselors sought a limiting instruction. *Cf., Berkey v. United States*, 318 F.3d 768, 773 (7th Cir. 2003). Contrary to Swanson's view that the evidence was "thin," there was an abundance of evidence to support a conviction of Swanson for his crimes. *Swanson II*, 483 F.3d at 513-14. In fact, the evidence against Swanson was overwhelming. Thus, any surplusage

in the superceding indictment would not have caused the jury to convict Swanson when otherwise it would not have; since the conviction was buttressed by overwhelming amounts of evidence presented at trial, no limiting instruction directed at the surplusage would have had any real or necessary effect.

For the reasons explained above, Swanson's trial counsel did not render deficient performance when they did not seek a mistrial, move to strike the surplusage or request a limiting instruction, nor was Swanson prejudiced by his trial counsels' actions or inactions in this regard. Without a showing of deficient performance and prejudice, Swanson's claim of ineffective assistance fails. *United States v. Lawson*, 947 F.2d 849, 853 (7th Cir. 1991) ("[C]ounsel does not render ineffective assistance by failing to pursue arguments that are clearly destined to prove unsuccessful, or by strategically choosing to pursue his client's strongest arguments and to forego marginal ones.").

### 2. Witness Testimony

Swanson's second specification of ineffective assistance of counsel is that his trial attorneys failed to object to improper hearsay and opinion testimony offered by witnesses Ronald Slavens, Jeffrey Stroburg, and Berkley Duck. *See* dkt 1, p. 8-10; dkt 7, p. 14-16. In response, the government argues that even if the portions of the testimonies of which Swanson complains were excluded, there was ample evidence presented at trial to convict Swanson. The post-hearing briefing specifically objects only to the testimony of Berkley Duck, see dkt. 69, p. 12-13, but because Swanson did not specifically waive his arguments as to Ronald Slavens and Jeffrey Stroburg, their testimony is also addressed below.

When the Countrymark Board of Directors became concerned about Swanson's business maneuvers, it hired a special counsel to investigate various events. The special counsel, Mr. Berkley Duck, a partner at the Indianapolis law firm of Ice Miller, worked with a team of attorneys in conjunction with an accounting firm to review Countrymark's transactions. Attorney Duck testified at trial. Swanson claims that portions of his testimony "improperly bolstered the government's contention that Swanson had committed fraud . . . ." (2255 Motion, pp. 8-10; Petitioner's Opening Memorandum, pp. 16-17).

Swanson points specifically to testimony wherein Mr. Duck stated that he had reviewed a letter authored by Swanson, addressed to Vickers & Allen, wherein Swanson assured Vickers & Allen that "previous financial commitments made to Vickers & Allen would be honored by any purchaser of Malta Clayton." Dkt. 69 at p. 12. When asked by government counsel if he had made any attempt "to determine the factual basis for the statement in that letter," Mr. Duck responded, "Yes." The following exchange then occurred:

Q    Were you successful?

A    No—well, we did not ultimately—if I could jump to our bottom line conclusion here, because there was not any legitimate role played by Vickers and Allen in this transaction.

Tr. 1289; see also dkt 69 at p.12. Swanson argues that this testimony, never objected to by his counsel, stated the broadest possible conclusion, a conclusion that rested on hearsay from sources that were never revealed. This testimony, Swanson maintains, went to the heart of the government's case: to wit, that Vickers & Allen had played no legitimate role in the Malta Clayton acquisition. Swanson insists that his trial attorneys' performance

was deficient when they failed to object to this testimony and that he was prejudiced because Mr. Duck's testimony had special weight and impact given his role as special counsel and his qualifications.

The government responds that, even if this one statement were inadmissible hearsay, it is impossible to reasonably conclude that this single statement had a "substantial and injurious effect or influence" on the jury's verdict. *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993) (a harmful error results only if the error had a "substantial and injurious effect or influence" on the jury's verdict). Our view in analyzing this contention by Swanson is consonant with that of the government: that in the end there was substantial—indeed overwhelming—evidence supporting Swanson's conviction and that any failure to object to a single statement on the grounds of hearsay, as made by Mr. Duck, would not and does not render the results of Swanson's trial unreliable. Thus, his claim of ineffective assistance of counsel on this ground is without merit. *Strickland*, 466 U.S. at 686.

In his motion for relief, Swanson also objected to Mr. Duck's testimony regarding a settlement agreement he entered into with Countrymark wherein, among other things, Swanson agreed to pay Countrymark $482,840 by April 18, 2000. (Trial Ex. 66). Swanson alleges that the testimony regarding the settlement agreement prejudiced his defense. This objection in our view is also without merit. The record reflects that Swanson's trial counsel strategically utilized the terms of the settlement agreement to undermine the amount of damages alleged by the government, attacking it as being far in excess of the loss amount agreed to in the settlement agreement. (Trial Tr. Vol. VIII, pp.1344-46; Dkt at 35-2, pp. 5-6. See also dkt at 35-1, pp. 2, 77-78). This strategic decision by trial counsel will not now be second guessed by the Court in a post-conviction relief petition.

18

*b. Jeffrey Stroburg*

Jeffrey Stroburg, Chairman of the Countrymark Board of Directors, testified in selected parts as follows:

!   "I had not heard of Vickers and Allen. And it became apparent based on some information that I was given at that time that other people in the company [Countrymark] who should have known about Vickers and Allen did not know that organization as well." Tr. 943.

!   Regarding the payment to Bruchez, Tr. 955-56: "We did some research and found he [Bruchez] was basically a real estate lawyer in Switzerland."

!   "We knew at the time that David Swanson had some property, or believed he had some property in Switzerland, but the company did not. . . . Although I'm not sure how it came across that it was just my understanding he had ownership of property in Switzerland." Tr. 976.

Swanson argues that the allegations and evidence relating to Bruchez were central to the government's prosecution of him and that Stroburg was allowed to present evidence without objection that was both speculative and without any foundation. This testimony, Swanson argues, improperly bolstered the government's contention that Swanson had committed fraud in the Buckeye acquisition and in the Malta Clayton acquisition.

The record reflects Swanson's attorneys' vigorous and extensive cross-examination of Chairman Stroburg regarding the underlying issues referenced in the above referenced statements, no doubt ameliorating to a certain extent any prejudice to Swanson. Further, even if these statements had been excluded at trial, there was ample other evidence presented to the jury to support a verdict of guilty as charged, as we have previously noted. It cannot be reasonably asserted, much less established, therefore, that the results of the trial were unreliable based on this testimony. Swanson's ineffective assistance of counsel

claim premised on trial counsels' failure to object to the cited portions of Stroburg's testimony is, once again, without merit.

### c. Ronald Slavens

Ronald Slavens, a Countrymark board member, testified regarding an exhibit admitted under stipulation in which various opinions, which according to Swanson were the product of hearsay and speculation, went unchallenged, the effect of which silence by his counsel was to bolster the government's contention that Swanson had committed fraud in the Buckeye acquisition and the Malta Clayton acquisition. The government responds that Slavens's testimony was not hearsay and, even if it had been, the introduction of this testimony was harmless error because of the extent to which it mirrored other evidence provided to the jury from other sources.

The testimony at issue dealt with Trial Exhibit 588, a letter from Robert A. Werner to Jeffrey L. Price, dated July 24, 1997. Mr. Werner was Countrymark's vice-president of finance who was later replaced by Mr. Price when Mr. Werner retired. Swanson complains that Mr. Slavens "essentially read from Exhibit 588 and added editorial comments that were also the product of hearsay and speculation." (Petitioner's Opening Memorandum, p. 15). More specifically, Swanson complains that Mr. Slavens "essentially" read the following portions of the letter:

> Both of the transactions [Buckeye and Malta Clayton] were laden with fees paid to professionals that would appear to be out of line for the transaction size.

> The Buckeye acquisition did not appear from the outset to make good business. Although no documentation is present to confirm it, you could speculate that David [Swanson] could not fulfill his obligations to Buckeye, and Countrymark was able to relieve him of those obligations.

(Trial Ex. 588, p. 1; Trial Tr. Vol. I, p. 40-42).

These statements do, indeed, constitute hearsay: "'Hearsay' is a statement, other than one made by the declarant while testifying . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Assuming the excerpted statements from the letter were offered to prove the truth of the matters asserted, to wit: that the transactions included fees out of line with the transaction size, that the Buckeye acquisition was not good business, and that Swanson could not fulfill his obligations to Buckeye, they are inadmissible hearsay. The letter, Trial Ex. 588, at issue here is distinguishable from the letter introduced in *United States v. Harper*, 463 F.3d 663 (7th Cir. 2006). In *Harper*, "[t]he letter was properly admitted to prove its effect on Harper–that its receipt spurred him to cover his tracks–and was strong circumstantial evidence of his guilty conscience." *Id.* at 668. In this case, there is no indication that the letter was introduced for any reason other than to prove the truth of the matters asserted. Had trial counsel objected to the introduction of these statements on the basis of hearsay, such objection would likely have been sustained.

Although Slavens's testimony included inadmissible hearsay, the information contained in Slavens's testimony duplicated evidence introduced at trial from other sources, making its inclusion in evidence at most harmless error when introduced through Slavens. *United States v. Hanson*, 994 F.2d 403, 407 (7th Cir. 1993) ("Needless to say, not all evidentiary errors require reversal. A conviction will stand if the district court's error was harmless."). Specifically, the same information testified to by Slavens was properly presented through the testimony of Selig Ziess, representatives of Vickers & Allen, Buckeye's CFO and through exhibits including an invoice submitted on behalf of Swanson

to Buckeye for $284,000 payable to Associated Capital, a firm run by Ziess; and through an itemized request from Swanson for an additional $247,392 in reimbursements from Buckeye related to the closing. Considering the extensive corroborative evidence provided at trial, it cannot be said that the jury's verdict would have been different had the hearsay statements at issue been excluded. Swanson's ineffective of assistance of counsel claim based on trial counsels' failure to object to the cited portions of Slavens's testimony is, again, without merit.

### 3. Count 18: Tax Evasion

Swanson's third specification of ineffective assistance of counsel is that his trial counsel improperly defended Count 18 of the superseding indictment, which charged Swanson with income tax evasion for the tax year 1996. It was the government's contention that Swanson failed to declare as income the money received by Vickers & Allen and later transferred to him. Swanson's trial counsel defended Count 18 on the theory that Swanson did not properly report his income because he believed he could offset his income for that year with a loss carry forward belonging to Realty Factors. Swanson argues now in his § 2255 motion that trial counsel should have defended on the basis that "none of the funds constituted income to [Swanson] as an individual," but instead were loans to Swanson "as a trustee for investment purposes." (2255 Motion, p. 7).

This issue was fully explored at the evidentiary hearing held on March 17, 2011, relative to the allegations in the § 2255 motion. Contrary to Swanson's assertion that his trial counsels' claimed justification for presenting the loss carry forward defense was inconsistent with other evidence presented by them at the hearing and therefore inherently

not credible, this court viewed Attorneys Voyles's and Lukemeyer's testimony and explanation for their defense strategy as entirely credible, particularly their reliance on Swanson's stated explanations to them in preparation for trial. In any event, any inconsistencies between the lawyers' testimony, respectively, on this point were minor, more likely attributable to the fact that nearly ten years had elapsed since the trial of this action.

Based on the record of the testimony provided at the hearing, we therefore conclude as follows:

> ! While preparing for trial, Swanson maintained that the funds at issue were a carry forward for tax purposes as a result of his involvement with Realty Factors. Attorney Voyles and Attorney Lukemeyer relied on the loss carry forward defense because it was consistent with Swanson's explanation for why he did not report income on his tax return and at the time was thought to be the only defense available to Swanson.

> ! The trial attorneys recognized that the loss carry forward defense was technically not a viable defense on the merits. But, in a criminal trial, the salient issue is whether the taxpayer acted with criminal intent in not treating certain monies as income. As explained by Attorney Lukemeyer, the loss carry forward was Swanson's explanation and "as wrong as it may have been, that was [Swanson's] explanation to the jury as to why he didn't claim it." Swanson's explanation, though in error, at least opened up a possible defense that Swanson lacked the requisite intent to evade tax. *United States v. Dack*, 747 F.2d1172, 1175 n. 3 (7th Cir. 1984) (willfulness is a necessary element of tax evasion; approving of jury instruction that stated "conduct is not willful if the income was omitted from his returns because of accident, mistake, inadvertence, or due to a good faith misunderstanding as to the requirements of the law"). This defense therefore represented a legitimate strategic choice by counsel.

> ! Swanson's trial attorneys testified that they no longer possessed a clear recollection of any specific conversation(s) with Swanson regarding whether the funds represented a loan from Vickers & Allen that would offset taxable income. Although Attorney Voyles's trial preparation notes reflect that they "need the agreement between David and VA and the loan agreement between them," (Evid. Hrg. Movant Exh. 7) Attorney Voyles and Attorney Lukemeyer testified that they were never provided with an executed copy of

the alleged loan agreement by either Swanson or Rogers & Wells (the firm that allegedly prepared the loan agreement). In fact, no executed loan agreement has ever been located to date.

! Swanson's claim that he did not request that his trial attorneys assert the loss carry forward defense and instead told them the money he received from Vickers & Allen in 1996 represented loan proceeds, which would not have been taxable income, and that there was an executed loan agreement to document the loan, is simply not credible. The unsigned "Master Promissory Note" allegedly prepared by Rogers & Wells and obtained from Rogers & Wells successor firm does little to advance Swanson's claim that an **executed** copy of the loan agreement ever existed or that he provided such to his counsel or that he ever informed them of how and where they could obtain that document. See Evid. Hrg. Movant Ex. 3. To date, no one has corroborated Swanson's claim that a loan agreement was created and was ever in existence. Swanson speculates that Mr. Craig Medwick (described by Swanson as the Rogers & Wells partner in charge of Swanson's legal work) could have answered questions about the preparation of the loan agreement at trial. But Swanson did not call Ms. Dana Aganastou, Mr. Medwick, or any other employee or former employee at Rogers & Wells to testify at the evidentiary hearing regarding the accuracy of the unexecuted loan agreement or regarding whether an executed loan agreement ever existed, nor did he introduce affidavits regarding the same. In short, we are unpersuaded that an executed loan agreement does now exist or ever actually existed. *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993) (defendant bears burden of proof and persuasion to establish ineffective assistance of counsel).

! Further, the unexecuted loan agreement (Evid. Hrg. Movant Ex. 3) that was tendered to the Court at the hearing is deficient on its face, lacking the signature of any entity or person who would have loaned the money to Swanson as well as any provision for liens or securing the loan; it is undated; there is no indication that it was prepared by a professional at Rogers & Wells, Price Waterhouse, or any other company; and the notary public signature block is not in proper form. Evid. Hrg. Tr., p.60-61, 82, 100-101. Finally, a loan from Vickers & Allen, far from being exculpatory, presented its own evidentiary problems for the defense because George Vickers, who testified at trial, maintained that he had only limited contact with Swanson and did not know anything about what Swanson had been doing. Evid. Hrg. Tr., p. 60-621. Finally, Vickers & Allen's bank account was in Swanson's name and, in essence, therefore, any loan would be a loan from himself. Docket at 35-1, p. 95; Evid. Hrg. Tr., pp. 61-62, 103-04.

Given these findings, we also conclude that Swanson's trial counsels' strategy in defending Count 18 appears to have been sound. There simply is no compelling evidence that Swanson was prejudiced by his trial counsels' strategy regarding the loss carry forward theory, which effectively defeats his claim of ineffective assistance of counsel.

### 4. Section 3B1.1(a) Sentencing Enhancement

Swanson's fourth specification of ineffective assistance of counsel is that Attorney Voyles waived or forfeited an objection to a sentencing enhancement based on the application of guideline 3B1.1(a) of the United States Sentencing Guidelines ("Sentencing Guidelines") at Swanson's initial sentencing hearing. Section 3B1.1(a) provides for a four-level upward adjustment of the base offense level, "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." A participant is defined as a person who is "criminally responsible for the commission of the offense." USSG 3B1.1, cmt. n. The government responds that Attorney Voyles, in fact, did not waive this issue and, even if he did, Swanson's argument that the enhancement was improper because he had acted alone is without merit.

In the sentencing context, an attorney's unreasonable failure to identify and bring to a court's attention an error in the court's Guidelines calculations that results in a longer sentence may constitute ineffective assistance entitling the defendant to relief. *U.S. v. Jones*, 635 F.3d 909, 916 (7th Cir. 2011) (citing *Glover v. United States*, 531 U.S. 198 (2001); *United States v. Reinhart*, 357 F.3d 521 (5th Cir. 2004); *United States v. Soto*, 132 F.3d 56 (D.C. Cir. 1997); *United States v. Headley*, 923 F.2d 1079, 1083–85 (3d Cir. 1991)). *But see, Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (*per curiam*)

(single error in context of otherwise vigorous advocacy on behalf of defendant must be sufficiently serious to demonstrate ineffective assistance of counsel).

### a. Background

In preparing Swanson's Presentence Investigation Report ("PSR"), the Court's Probation Office recommended an increase to Swanson's offense level under U.S.S.G. § 3B1.1(a) of four points because "the criminal activity the defendant organized was extensive." PSR at ¶55.

Swanson's trial counsel, Mr. Voyles, filed a written objection to this enhancement, stating: "Defendant objects to any adjustment pursuant to Section 3B1.1 as the evidence revealed there was no criminal organization. The evidence did not reveal any other participants in the scheme alleged by the government." See dkt 120 at 9.

At the original sentencing hearing, in the course of a discussion between the court and defense counsel relating to which edition of the sentencing guidelines should be applied, the 1998 version or the 2002 version, the following exchange occurred:

| MR. VOYLES: | That I saw. We don't disagree with page – or rhetorical paragraph 54. |
| THE COURT: | 3.[B]1.1(a)[2] |
| MR. VOYLES: | Right. |
| THE COURT: | Do you agree there's a four level increase there? |
| MR. VOYLES: | Yes. |

---

[2] The transcript contains a typographical error, reflecting "3V1.1(a)" instead of "3B1.1(a)." There is no 3V1.1(a) in the sentencing guidelines.

Through this statement, the Court understood that Swanson's counsel was waiving his previously advanced written objection to the four-level enhancement under 3B1.1(a). The 3B1.1(a) enhancement was not discussed again at the original sentencing hearing; this exchange was the only mention of it. *See United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) ("we have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

That said, after reviewing the sentencing transcript, in hindsight, this court believes that Mr. Voyles intended his affirmative response to the question ("Do you believe there's a four level increase[?]"), which occurred during an admittedly fast paced colloquy, to reflect that he did not object to the **two** level enhancement provided for in paragraph 54 of the PSR pursuant to § 3B1.3.

In his first appeal, as previously noted, Swanson challenged his sentence, but not his conviction. See *Swanson I*. However, the argument that the 3B1.1(a) four-level enhancement was improperly applied was not raised in the first appeal by Swanson's counsel, Terence F. MacCarthy ("Attorney MacCarthy"),[3] although the Seventh Circuit advised in a footnote that on remand,

> depending on the Court's ultimate conclusion in *Booker* and *Fanfan*, the district court also may need to reconsider the other sentencing enhancements included in the pre-sentence investigation report (PSI) including the enhancement for the sophisticated means employed during the commission of the crime (U.S.S.G. § 2B1.1(b)(8)(C)), for abuse of a position of trust (U.S.S.G. § 3B1.3), and for extensive criminal activity (U.S.S.G. § 3B1.1(a)) (R. at 122).

*Swanson I*, 394 F.3d at 526.

---

[3] Oddly, Swanson's present counsel, Mr. Theis, suggests that he represented Swanson during his first appeal, although the record suggests otherwise.

Thereafter, at resentencing and upon further consideration of the evidence adduced at trial, the Court again applied the 3B1.1 enhancement, concluding that:

> . . . what we have here is arguably fewer than five participants, but it certainly does qualify as "otherwise extensive" under the application note for the reasons laid out and permitted as considerations in application note 3. So I'll . . . allow the 4 level enhancement to stand . . . .

Resent. Tr., p. 22-23.

This enhancement, when challenged in Swanson's second direct appeal, escaped Seventh Circuit review when it declined to consider the issue on the merits in *Swanson II,* because it had not been raised in the first appeal. The Seventh Circuit found that Swanson "cannot use the accident of a remand to raise in a second appeal an issue that he could just as well have raised in the first appeal." *Swanson II*, 483 F.3d at 515 (citation to quotation omitted). In light of this procedural history, we now address below Swanson's specific claims of ineffective assistance of counsel in this context:

### a. Performance

We are clearly of the view that Mr. Voyles did not intentionally waive or forfeit his written objection to the § 3B1.1(a) enhancement. Moreover, the record reflects that Attorney Voyles vigorously and extensively advanced Swanson's interests at sentencing by arguing for various ameliorative adjustments, including the appropriateness of relying on the 1998 version of the sentencing guidelines, arguing against an obstruction of justice enhancement, and in favor of a downward departure from the guideline computation. Thus, we find that Attorney Voyles's advocacy at sentencing was well within the "wide latitude of permissible attorney conduct." *See Washington v. Smith*, 219 F.3d 620, 627 (7th Cir. 2000).

"[B]ecause counsel is presumed effective, a defendant bears a heavy burden in challenging his attorney's effectiveness." *United States v. Hatten-Lubick*, 525 F.3d 575, 579 (7th Cir. 2008); *see also United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (there is a "strong presumption that the attorney performed effectively").

  b.    *Merits of Claim*

That said respecting Mr. Voyles's competent sentencing advocacy, we concede that the guideline calculation utilized at Swanson's original sentencing (and at his resentencing) improperly included a four-level enhancement, pursuant to § 3B1.1(a). The Seventh Circuit has "made it very clear that Guideline § 3B1.1 requires that the offense involve more than on participant." *U.S. v. Velarde*, 39 Fed.Appx. 383, 384, 2002 WL 1022019, 1 (7th Cir. 2002) (internal quotation omitted); *United States v. Tetzlaff*, 896 F.2d 1071, 1075 (7th Cir. 1990); *see also United States v. Herrera*, 878 F.2d 997 (7th Cir. 1989). In the course of briefing this issue, the government provided numerous citations to cases from this circuit discussing the "otherwise extensive" prong of § 3B1.1, but none of its cited authorities applied the enhancement where a defendant did not direct at least one criminal participant, and our research has failed to identify any such case as well. *United States v. Miller*, 962 F.2d 739, 745 (7th Cir. 1992) (noting that "there is no prescribed minimum number of persons needed to permit an enhancement under § 3B1.1. All that is required to find that a scheme is 'otherwise extensive' is that the defendant directed at least one criminal participant."); *United States v. Austin*, 54 F.3d 394, 405 (7th Cir. 1995) (remanded to determine if defendant directed at least one criminal participant and if the defendant's organization was "otherwise extensive.")

As previously stated, a participant is defined as a person who is "criminally responsible for the commission of the offense." USSG 3B1.1, cmt. n. 1. If this threshold requirement is not met, additional analysis regarding whether the criminal activity was otherwise extensive is irrelevant. *U.S. v. DeCicco*, 899 F.2d 1531, 1535 (7th Cir. 1990) (finding that the Sentencing Commission intended § 3B1.1 to apply only to situations where the offender organizes or leads criminally responsible individuals).

Swanson correctly notes that the government has never been able to identify any other person(s) criminally responsible for the offenses charged in the indictment. This issue was specifically addressed at resentencing. See Resent. Trans. pp. 16-23. Even now, the government has not identified another participant in the offenses of which Swanson stands convicted. The government explains:

> While Swanson may not have supervised "another participant" as that term is used in USSG § 3B1.1, cmt. n.1, evidence at trial established that there were several individuals who either knowingly or unwittingly aided Swanson. (Resent. Tr., p. 17-21). For example, Mr. Rosenfelt, the New York attorney who prepared false documents for Swanson (Resent. Tr., p. 17) and the principals of Vickers & Allen who allowed Swanson to set up a phony company of which Swanson submitted fraudulent invoices. (Resent. Tr., p. 19). Swanson directed the CFO at Countrymark and Keith Stolts at Buckeye to pay fraudulent invoices. (Resent. Tr., p. 17-18). He directed underlings at Countrymark to transfer the fraudulently obtained money into accounts he controlled. (Resent.Tr., p. 18). Swanson's wife, Carolyn, signed bank documents containing information she knew to be false with respect to Realty Factors, an account in which money was funneled. (Resent. Tr., p. 20). He caused a principal loss of over $2,500,000, and involved many knowing and unknowing individuals in his criminal activity.

In a sense, the persons identified above are more accurately viewed as victims of, rather than collaborators in, Swanson's schemes. Had there been at least one other criminally responsible person, there would be no doubt that the four-level enhancement was proper

because Swanson's criminal activity was "otherwise extensive." But, as we have noted, no other criminally responsible person has ever been identified as a participant in Swanson's crimes. Thus, we hold that the four-level enhancement was, indeed, erroneously applied.

### c. Prejudice

The government asserts that, even if the four-level increase provided by § 3B1.1(a) was improperly applied, there was no prejudice to Swanson because he would, in any event, have been subject to a two-level increase pursuant to § 3B1.1(c), and his 151-month sentence would still fall within the guideline range. This is not accurate, however, since all adjustments pursuant to § 3B1.1 require that the offense was committed by more than one participant. Without the four-level increase, Swanson's offense level would have been 30, which, with a criminal history category of I, would yield a guideline range for imprisonment under the 1998 Guidelines Manual of 97-121 months.

As noted above, it was in error that the § 3B1.1 enhancement was applied to Swanson at his original sentencing. If this issue had been raised by his counsel on direct appeal, there is a reasonable probability that it would have been resolved in Swanson's favor and this court would have been directed to reconsider Swanson's sentence in light of that ruling.

Even so, having now in fact reconsidered the issue, we cannot find that Swanson was prejudiced by this error. We remain persuaded that the sentence imposed of 151 months incarceration would not have been less, even if the guideline calculation had been correctly applied. Unless it can be shown that Swanson's sentence would have been lower, but for the § 3B1.1 enhancement, his request for § 2255 relief on this ground must be

31

denied. *Stallings v. U.S.,* 536 F.3d 624, 628 (7th Cir. 2008)(giving district court authority to determine whether prejudice existed in context of ineffective assistance of counsel claim by stating whether it would have imposed the same sentence).

We hold that Swanson's 151-month sentence is reasonable and thus independently justifiable as an upward departure from the guideline's range. When the 151-month sentence was imposed at resentencing, this court considered and applied the guidelines in their advisory role and meted out a reasonable sentence that was sufficient but not greater than what was required under the statutory factors. *United States v. Booker*, 543 U.S. 220 (2005). The court gave meaningful consideration to each of the 18 U.S.C. § 3553(a) factors and found the 151-month sentence to be reasonable under the individual circumstances of this defendant and the criminal conduct committed by defendant Swanson, including, but not limited to the following: Swanson devised, organized and executed the complex, extensive web of sophisticated financial crimes; he reaped exceedingly large financial gains from his fraud, virtually all of which he retained for his own exclusive use; his schemes were perpetrated over a long period of time; he caused losses exceeding $2,000,000, victimizing multiple business enterprises and many individuals most of whom he duped into being unwitting participants in his schemes. Further, Swanson expressed no apparent contrition or regret and clearly no acceptance of responsibility for his crimes. His absconding prior to his initial sentencing hearing underscored his lack of acceptance of responsibility and his general attitude of contempt.

In summary, Attorney Voyles's performance at the original sentencing was in all respects effective. Further, Swanson has failed to show that he suffered any real prejudice as a result of the erroneous application of the §3B1.1 enhancement because, with or

without the four-level enhancement under §3B1.1, the 151-month sentence imposed by the Court was reasonable, as a matter of law and fact. The § 2255 motion must be denied on this basis as well.

### 5. Evaluation by Outside Parties

Swanson's fifth specification of ineffective assistance of counsel is that both of his trial counsel were ineffective in failing to present evidence to show that two of the alleged transactions had been evaluated by outside parties, which testimony might have rebutted or offset the government's allegations and evidence of wide-spread fraud on his part.

It is true that defense counsel has an obligation to investigate the facts of a case and to marshal exculpatory evidence when such exists. In this case, however, there is no evidence that Swanson's trial attorneys failed to gather and present whatever exculpatory evidence was available at the time of trial. The specific evidence cited here in any event has not been shown to have actually been available at the time of trial. Speculation that exculpatory documents existed at trial is an insufficient ground upon which to grant relief pursuant to § 2255. Further, the record reflects that Swanson's trial counselors "did attempt to collect underlying documentation supporting the invoices specified in the various transactions (i.e. due diligence paperwork, P & E statements, feasibility studies, etc.). Attempts to do so, through Mr. Swanson who had claimed to have performed much of the work, proved fruitless as he was unable to provide [them] such documents." (Ex. A, Lukemeyer Declaration,¶ 8).

In addition, the alleged failures of trial counsel under review here do not constitute ineffective assistance of counsel, because Swanson has failed to show any prejudice

flowing from the omitted evidence of outside evaluations of the transactions. The mere fact that a third party found no fraud when he/it evaluated certain transactions does not mean that fraud did not exist. The indictment alleged, and evidence at trial proved, that the fraudulent nature of the closing documents was not revealed until well after the closing. (Superseding Indictment, ¶¶ 36-42; Trial Ex. 103, Trial Tr. Vol. V, pp. 943, 950-55 and Vol. VIII, pp. 1363-64). *United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts. The only issue is whether there is a plan, scheme or artifice to defraud."). Because Swanson has failed to demonstrate that these alleged errors rendered his trial unfair and unreliable, he is entitled to no relief on this ground based on the motion before us. *Bruce v. United States*, 256 F.3d 592 (7thCir. 2001) (prejudice requires defendant to establish a reasonable probability that counsel's failure to investigate affected the trial's outcome).

### 6. Federal Rule of Evidence 404(b).

Swanson's sixth specification in support of his claim of ineffective assistance of counsel is that his trial counsel should have moved for a mistrial or other appropriate relief after the introduction of evidence regarding various start-up companies, including GreenHeat, Biolan, and La Hacienda, proved insufficient to establish that he had committed fraud in those deals. Swanson asserts that evidence regarding these transactions was improperly admitted pursuant to Rule 404(b) of the *Federal Rules of Evidence.* Swanson admits that his trial attorneys did object to this evidence, but maintains that they objected

for the wrong reasons. Trial counsel objected on the grounds that the evidence created unfair prejudice. Swanson contends that they should have objected on grounds that the government failed "to establish that Swanson committed fraud with regard to any of these three entities." In response, the government argues that the evidence establishing that Swanson committed fraud in connection with GreenHeat, Biolan, and La Hacienda was properly proffered and admitted under Rule 404(b) and, in any event, that Swanson was not unfairly prejudiced by the introduction of this evidence, given the overwhelming amount of other evidence establishing Swanson's guilt of the charged offenses.

A decision to admit "other crimes" evidence essentially combines the requirements of Rules 404(b) and 403 of the *Federal Rules of Evidence* according to the following four-pronged test:

> Evidence of "other crimes" must (1) be directed toward establishing something other than the defendant's propensity to commit the charged offense (here, the identity and modus operandi of the perpetrator), (2) show sufficient similarities in time and manner to establish relevance to the charged conduct, (3) be sufficient to support a jury finding that the defendant committed the similar act, and (4) have probative value that is not substantially outweighed by the danger of prejudice to the criminal defendant.

*United States v. Rollins*, 301 F.3d 511, 519 (7th Cir. 2002). In addition, *modus operandi* evidence must "bear a singular strong resemblance to the pattern of the offense charged." *Id.* (*citing United States v. Moore*, 115 F.3d1348, 1354-55 (7th Cir. 1997)).

Swanson's challenge to his trial counsel's conduct goes only to the third prong of the test, *i.e.* that the evidence be sufficient to support a jury finding that the defendant committed the similar act. As acknowledged by Swanson, the government at trial submitted bank records concerning the transfer of funds into bank accounts over which Swanson had exclusive access and control. The government is correct on this point. Thus,

the bank records alone were sufficient to establish that Swanson misused his positions to convert to his personal use funds invested in GreenHeat, Biolan, and LaHacienda, and that he followed the same or similar pattern in committing his frauds using false Vicker & Allen invoices. As noted by the Seventh Circuit, "[Swanson] followed this scheme in procuring ADM's investment in GreenHeat, just as he did in promoting Countrymark's acquisition of Malta Clayton." *See Swanson II*, 483 F.3d at 514 (affirming the inclusion of GreenHeat in the fraud loss calculation). Douglas Schmalz, ADM's CFO testified that he questioned some of the expenses attributed to GreenHeat. (Trial Tr. Vol. XI, pp. 1869-70;Trial Ex. 435). The bank records and Mr. Schmalz's testimony sufficiently established Swanson's fraudulent conduct relative to GreenHeat, and the bank records associated with GreenHeat, Biolan, and LaHacinda support a conclusion that Swanson had the intent to defraud, as charged in the Superseding Indictment, and that his modus operandi in all the frauds was similar.

Further, any error in the admission of evidence related to GreenHeat, Biolan, and LaHacinda was harmless given that the "untainted incriminating evidence [was] overwhelming." *United States v. Macey*, 8F.3d 462, 476 (7th Cir. 1993). Contrary to Swanson's claims, the government presented overwhelming evidence of Swanson's guilt during the three-week trial. The frauds were well documented and numerous witnesses confirmed their tawdry, dishonest details. In addition, the Court instructed the jury to limit its consideration to "the offenses charged in the indictment" (see Jury Instruction No. 51), thereby ameliorating any possible risk of unfair prejudice from the 404(b) "other crimes" evidence. *Rollins*, 301 F.3d at 520; *United States v. Brooks*,125 F.3d 484, 500 (7th Cir. 1997) (holding that adequate limiting instructions were sufficient to cure any potential

36

prejudice from admission of Rule 404(b) evidence); *United States v. Jones*, 248 F.3d 671, 676 (7th Cir. 2001) (holding that reviewing court will assume that jury followed a Rule 404(b) limiting instruction). Based on the totality of the evidence presented at trial, the jury's verdicts are altogether reliable, reasonable and appropriate. Swanson's effort to establish ineffective assistance or that he was prejudiced by the introduction of the 404(b) evidence is unavailing.

### 7.  Stolen Money, 18 U.S.C. § 2315

Swanson's seventh specification of ineffective assistance of counsel is that his trial counsel failed to seek a judgment of acquittal on Counts 2-8 and 10-13, which charged him with receiving stolen money in violation of 18 U.S.C. § 2315. Swanson's assertion that such a motion would have been appropriate because "a bank credit is not 'money'" is patently frivolous, an opinion we assume that is shared by Swanson's present counsel who left this contention undeveloped in his briefing of the § 2255 motion. See dkt. 1 at p. 19. Swanson cites no case law to support this argument—for good reason, since several circuits have expressly rejected similar arguments.   Electronic crediting and debiting of financial transactions clearly falls within the proscriptions of 18 U.S.C. § 2315. *See United States v. Kroh*, 896 F.2d 1524 (8th Cir. 1990) (citing cases and rejecting defendant's argument that "since wire transfers of money are no more than electronic credits and debits," they are not within the meaning of 18 U.S.C. §§ 2314 and 2315), *reversed on other grounds,* 915 F.2d 326, 327 (8th Cir. 1990); *United States v. Goldberg*, 830 F.2d 459, 466 (3d Cir. 1987)("It is a fact of life in today's highly computerized and technological society that

transfers of money between accounts are generally accomplished electronically."); *see also* *United States v. Gilboe*, 684 F.2d 235, 238 (2d Cir. 1982). The feebleness of this argument was not lost on his trial attorneys either, who recognized that "the monies that were part of the closing disbursements ended up into [Swanson's] or his wife's personal accounts. Evidence from those accounts showed money going out for regular goods and services supporting the fact that he was in possession of actual 'money' as it made its way back into commerce." (Ex. A, Lukemeyer Declaration, ¶ 10). Swanson's claim of ineffective assistance of counsel on this ground fails in all respects.

## 8. Jury Instruction 22: Profits vs. Gross Receipts

Swanson's eighth and final specification of ineffective of assistance of counsel is that trial counsel failed to object to the court's instructions on money laundering. Swanson asserts that, in order for the jury to convict him of money laundering, the government had to prove that the money was "profits" and not "gross receipts" from the illegal activity. Although raised in his initial § 2255 motion, this argument was not further developed in the briefing by Swanson's counsel. In response, the government argues that the money laundering charge at issue here was predicated on Swanson's use of the profits from his illegal mail and wire frauds. Because the evidence at trial established that the "proceeds" were "profits" derived from the scheme(s) and did not constitute expenses of the underlying fraudulent activity, the failure to provide a profits definition of proceeds was at most harmless error and in fact unnecessary.

Swanson apparently bases this theory of relief on the holding in *U.S. v. Santos*, 553 U.S. 507, 514 (2008), wherein five Supreme Court justices concluded that the term "proceeds" in the money laundering statute, 18 U.S.C. § 1956(a)(1), means "profits" rather than "receipts." However, Swanson was charged and convicted under a different money laundering statute, 18 U.S.C. § 1957. Tracking the language of that statute, the jury instruction properly defined "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." (Jury Instruction No. 22).

In Swanson's case, the laundered "proceeds" were "profits," as opposed to expenses or receipts, and thus the *Santos* ruling, even if it were a more authoritative holding, would not require reversal of Swanson's money laundering convictions. The evidence at trial established that Swanson instructed that the overstated acquisition costs of the Malta Clayton deal, i.e. the profit of $4 million, be deposited into a bank account over which he maintained sole control. "Swanson then created false invoices to cover the diversion of $2 million from that account, and the remaining $2 million was at risk of a similar fate." *Swanson II*, 483 F.3d at 513-14. Swanson's schemes generated millions of dollars, all for him, and involved almost no overhead or expense. There was no evidence that there were any employees to pay or expenses incurred by him; instead, every bit of the money Swanson fraudulently obtained constituted profit to him. "There is no mystery about what Swanson did with the funds he diverted; he sent a sizable amount to a lawyer in Switzerland and moved the rest to his personal bank account." *Swanson II*, 483 F.3d at 514. Swanson has not provided any evidence to demonstrate that the proceeds were in fact expenses rather than profits and that the failure to provide a jury instruction specifically defining proceeds as "profits" had "some conceivable effect on the outcome of the

proceeding." *Strickland*, 466 U.S. at 693. Swanson's self-serving allegation relies on a distortion of both the evidence and the applicable law, and is insufficient to overcome the extensive record establishing that his fraudulently obtained monies were ultimately deposited into accounts which he alone controlled. Like his other claims of ineffective assistance of counsel, this one fails as well.

## IV. Conclusion

For the reasons explained above, Swanson is not entitled to relief on his §2255 motion. He has failed to demonstrate a constitutional violation warranting collateral relief. The trial and appellate record as supplemented by the evidentiary hearing conducted on this motion, when considered in light of all the applicable principles of law, establish conclusively that Swanson is not entitled to the relief he seeks in his post-conviction petition. There was no ineffective assistance of counsel throughout his protracted trial. None of the grounds asserted by him have been shown to amount to a fundamental defect in the proceedings causing a complete miscarriage of justice. Accordingly, his motion for relief pursuant to § 2255 is **denied**, and this action is dismissed with prejudice. Judgment consistent with this Entry shall now issue.

## V. Certificate of Appealability

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Swanson has failed to show: (1) that reasonable jurists would find this court's "assessment of the

constitutional claims debatable or wrong," or (2) that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this court] was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The court therefore also **denies** a certificate of appealability.

     **IT IS SO ORDERED.**

Date: _05/25/2011_

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Gerald A. Coraz
UNITED STATES ATTORNEY'S OFFICE
gerald.coraz@usdoj.gov

William H. Theis
FEDERAL DEFENDER PROGRAM
william_theis@fd.org